IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 10, 2002 Session

## STATE OF TENNESSEE v. JODY LANE ORR

**Direct Appeal from the Circuit Court for Carroll County**
**No. 01cr-1636      C. Creed McGinley, Judge**

---

**No. W2001-02075-CCA-R3-CD  - Filed November 27, 2002**

---

The Appellant, Jody Lane Orr, was convicted by a Carroll County jury of aggravated burglary, aggravated rape, and class E felony theft.  He received an effective twenty-five-year sentence.  On appeal, Orr raises the following issues for review:  (1) whether the trial court erred by denying his motion to suppress; (2) whether the State lost and/or mishandled a blood sample drawn by law enforcement after his arrest; (3) whether the evidence was sufficient to support the verdicts; and (4) whether his sentence was proper.  After a review of the record, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY, J., joined.  JOSEPH M. TIPTON, J., filed a concurring opinion.

Charles N. Griffith, Waverly, Tennessee, for the Appellant, Jody Lane Orr.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; P. Robin Dixon, Jr., Assistant Attorney General; G. Robert Radford, District Attorney General; and Eleanor Cahill, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On September 24, 2000, the victim, Trina Knowles, returned home from a friend's birthday party at approximately 12:30 a.m.  Upon returning home, she had a message on her answering machine from Richard Forrest, the co-defendant in this case.  She did not return his call; instead, she "put a movie in and laid down on the couch and went to sleep."  Later, the victim was awakened by the co-defendant "banging on the doors and on the windows, calling [her] name;" she did not answer

the door and fell back asleep. Later, she was awakened by the Appellant and co-defendant; "one was holding [her] down . . . and the other one was duct-taping [her] ankles and wrists and around [her] mouth and [her] head." Both men wore bandannas covering their faces; however, the victim recognized the co-defendant and said, "Richard," before duct-tape was placed over her mouth and a bandanna over her face. After ransacking the trailer, the two men "ripped [the victim's] panties off, pulled [her] legs up in the air and penetrated [her] vaginally." Then, the victim was flipped over on the couch, and "they anally raped [her]." After the victim was raped, she was told not to tell anybody of the incident or she would be killed. A telephone cord and breathing tube were also wrapped around her ankles, and a New Year's Eve hat was placed on her head. After freeing herself, she drove to a friend's house and, from there, the police were called. Upon examination at the hospital, the victim complained of bleeding from the rectum and red marks, "which later turned into scabs, around [her] ankles and . . . wrists and . . . mouth."

After the victim told police she recognized one of her assailants, the co-defendant was developed as a suspect in the rape. The Appellant and co-defendant were found at Peggy Lane Trailer Court in the co-defendant's residence. A search of the trailer was conducted and several items belonging to the victim were discovered; jewelry, two VCRs, medicine bottles, and a piggy bank. Also discovered were items which incriminated the Appellant and his co-defendant in the alleged crimes; bandannas, gloves, and part of a breathing tube. Thereafter, both men were taken to the police department and signed written confessions, detailing the crimes committed against the victim. A Carroll County grand jury indicted the Appellant and co-defendant for aggravated burglary, three counts of aggravated rape, and theft between $500 and $1,000. The co-defendant pled guilty, received a seventeen-year sentence, and testified against the Appellant at trial. After a trial by jury, the Appellant was convicted of one count of aggravated burglary, aggravated rape, and class E felony theft. Following a sentencing hearing, he received a twenty-five-year sentence and was ordered to pay a $61,000 fine. His motion for new trial was denied, and this timely appeal followed.

## ANALYSIS

### I. Motion to Suppress

The Appellant argues that the trial court erred by denying his motion to suppress. Specifically, he contends that: (1) evidence found inside his "living quarters" should have been suppressed because the person who granted the waiver to search was without authority to do so, and (2) the waiver of his right to remain silent was not voluntarily and knowledgeably given because he was sleep-deprived and under the influence of intoxicants or other substances and, therefore, any statements made to law enforcement officers were inadmissible.

In reviewing a denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the

suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. *Id.; see also State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Indeed, these findings will be upheld unless the evidence preponderates otherwise. *Daniel,* 12 S.W.3d at 423. In this case, the trial court denied the Appellant's motion to suppress, finding that:

> . . . I'm satisfied that the defendant, while he might have been sleepy or under the influence of possibly alcohol or controlled substances, that he understood his rights, that he waived those rights freely and voluntarily, and he understood those rights when he in fact waived them. . . .
>
> Concerning the search of the house, first of all, I find that essentially, he has no standing. He might have been a temporary resident there, but certainly the officer got a consent from the person that owned this property. There was someone there to let them in that had access, and there is no indication that this search was anything other than valid and with the consent of the property owner. . . .

## A. Search

**1.      Standing.**      First, the State maintains that the Appellant does not have standing to contest the search of the residence. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Article I, Section 7 of the Tennessee Constitution similarly provides "[t]hat the people shall be secure . . . from unreasonable searches and seizures." TENN. CONST. art. I, § 7. In the context of these constitutional provisions, the so-called "standing" requirement is simply the rigorous application of the principle that the rights thereby secured are personal. *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S. Ct. 421, 428 (1978). One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place or thing to be searched. *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App.), *perm. to appeal denied,* (Tenn. 1991). One who does not have such an expectation of privacy lacks "standing" to challenge the search. *See State v. Patterson*, 966 S.W.2d 435, 441 n.5 (Tenn. Crim. App. 1997). Standing is ultimately a question of law, subject on appeal to *de novo* review, against the backdrop of a trial court's factual determinations. *State v. James A. Jackson*, No. M1998-00035-CCA-R3-CD (Tenn. Crim. App. at Nashville, May 5, 2000) (citations omitted). There are seven factors to be considered when determining if a legitimate expectation of privacy exists: (1) ownership of the property; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether the defendant has a right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from intrusion by the State; (6) whether the defendant took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises. *Oody*, 823 S.W.2d at 560.

The fact that a person is an overnight guest in a residence or an apartment, standing alone, is sufficient to clothe the guest with a legitimate expectation of privacy in the premises sufficient to

challenge the search and any resulting seizure. *State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996) (citing *Minnesota v. Olson*, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 1688 (1990)). However, a "casual visitor" or a "transient party guest" does not have a reasonable expectation in the host's residence or apartment. *Id.* (citing *United States v. David Dix*, No. 94-4065 (6th Cir., June 9, 1995); *United States v. Maddox*, 944 F.2d 1223, 1234 (6th Cir. 1991), *cert. denied*, 502 U.S. 992, 112 S. Ct. 600 (1991)).

In this case, the evidence established that the Appellant had been staying at the residence for approximately two to three weeks at the time the search of the premises was conducted. The Appellant stated he "was staying at Mr. Forrest's trailer for a time, 'cause [he] was in between houses." The Appellant did not pay rent but, rather, the arrangement was that he would "buy the food and stuff and cook." The Appellant was present in the residence when the search was performed. Based upon the foregoing principles, we conclude, contrary to the ruling of the trial court, that the Appellant did have a legitimate expectation of privacy in the residence and, therefore, had standing to challenge the validity of the search. Accordingly, we proceed to address the merits of the Appellant's argument concerning the search of the premises.

**2.     Consent.**     Under both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution, a warrantless search of a person's home is presumed unreasonable. *State v. Bartram*, 925 S.W.2d 227, 229-230 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971)); *see also State v. James Darrell Horn*, No. 03C01-9810-CR-00363 (Tenn. Crim. App. at Knoxville, Jan. 26, 2000). However, there are many well-recognized exceptions to this rule, including a search conducted pursuant to consent. *Bartram*, 925 S.W.2d at 230. The State has the burden of establishing that the search was conducted pursuant to this exception. *Id.* If the State fails to satisfy its burden, the exclusionary rule may operate to bar the admissibility of any evidence obtained directly or derivatively from the unconstitutional search. *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963); *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992). Our review is *de novo,* as mixed questions of law and fact are involved. *State v. William Donald Ellis*, No. M1999-783-CCA-R3-CD (Tenn. Crim. App. at Nashville, Oct. 13, 2000) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). Review is not limited to the record of the suppression hearing; rather, it extends to the entire record of proceedings, including, in this case, the Appellant's trial. *Id.* (citing *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998)).

In this situation, Officer David Bunn obtained verbal consent to search the residence from the property owner, Barbara Forrest, the co-defendant's mother. When Officer Bunn arrived at the residence, Tim Forrest was present at the residence and executed a written waiver to search the trailer. Tim Forrest is the brother of the co-defendant Richard Forrest. During the search of the trailer, items belonging to the victim were discovered. At trial, all of these items were admitted into evidence, the trial court finding that consent of the property owner was sufficient to search the residence.

We, first, conclude that the property owner did not have authority to permit a search of the residence. She did not live at the trailer; therefore, she did not possess authority over its premises. "To justify a warrantless search of premises owned or occupied by a citizen as a residence, he must give his consent, or such consent must be given by someone authorized by him, or having a common possessory interest or right. . . ." *Rippy v. State*, 550 S.W.2d 636, 640 (Tenn. 1977) (apartment manager's sister cannot consent for a tenant); *see generally Stoner v. California*, 376 U.S. 483, 84 S. Ct. 889, *reh'g denied*, 377 U.S. 940, 84 S. Ct. 1330 (1964) (hotel clerk cannot consent for guests); *Chapman v. United States*, 365 U.S. 610, 81 S. Ct. 776 (1961) (landlord cannot consent for a tenant). The modern test concerning consent searches, as enunciated by the United States Supreme Court,

> is that the consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared. The court defined common authority as the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Bartram*, 925 S.W.2d at 230-31 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7 (1974)). Ownership of the property alone is not enough; mutual use by one having joint access or control of the premises is required. *Id.*; s*ee Rippy*, 550 S.W. 2d at 640; *McGee v. State*, 451 S.W.2d 709, 712 (Tenn. Crim. App. 1969), *perm. to app. denied*, (Tenn. 1970) (citation omitted). Barbara Forrest did not use or occupy the trailer and, therefore, could not validly consent to a search of the premises.

Next, we must determine whether the waiver by Tim Forrest constituted valid consent to search the trailer. When Officer Bunn arrived at the trailer, Tim Forrest, who had slept in the trailer that evening, gave written permission to search the residence. Thus, the issue is whether Tim Forrest had "common authority" over the trailer. In the Appellant's brief, he asserts that Tim Forrest did not reside in the trailer; in contrast, the State contends that the co-defendant testified at trial that he lived at the residence with both Tim Forrest and the Appellant. The following colloquy is the only testimony of the co-defendant Richard Forrest which references the residents of the trailer:

Q. Mr. Forrest, where were you living on September the 24th 2000?

A. Peggy Lane Trailer Court.

Q. Who was residing with you?

A. My brother was starting to move in, and Jody Orr had been living with me for about two months – I mean, two weeks.

The co-defendant Richard Forrest has two brothers, Tim and Greg, both of whom were present when Officer Bunn arrived to conduct a search of the premises. The co-defendant provided no explanation as to the meaning of the phrase "starting to move in," *i.e.*, it is unclear whether Tim Forrest had "mutual use of the property by generally having joint access or control for most purposes. . . ." *Bartram*, 925 S.W.2d at 230-31 (quoting *Matlock*, 415 U.S. at 171 n.7). Tim Forrest did not testify at trial. Furthermore, there is no other evidence or testimony which supports the State's assertion that Tim Forrest resided in the trailer. Because the State has the burden of establishing that the search was conducted pursuant to this exception, we conclude that the State has not sufficiently shown that Tim Forrest had "common authority" over the trailer. Accordingly, the search of the premises was unconstitutional, and the evidence seized during the search was inadmissible.

**3.      Harmless error.**      We must now determine whether the convictions must be reversed under the circumstances of this case. Once constitutional error is found, the burden shifts to the State to prove the error is harmless and the reviewing court must be persuaded beyond a reasonable doubt that the error did not affect the trial outcome in order to deem the error harmless. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). The inquiry is "whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Satterwhite v. Texas*, 486 U.S. 249, 258-59, 108 S. Ct. 1792, 1798 (1988) (quoting *Chapman*, 386 U.S. at 24). In this case, the co-defendant testified against the Appellant at trial, and the Appellant confessed to his crimes. Given the strength of the State's case, we hold that no prejudice to the Appellant occurred as a result of the evidence being admitted. Any error was harmless beyond a reasonable doubt. *See Rippy*, 550 S.W.2d at 641. Accordingly, we find this issue to be without merit.

## B. Confession

The Appellant argues that his confession was not given knowingly and voluntarily because he was "sleepy and slow" due to his use of drugs and alcohol. He contends that his "statement was made by paraphrasing the statement of Richard Forrest and out of the need to get some sleep." Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *See Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624, (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992), *cert. dismissed*, 510 U.S. 124, 114 S. Ct. 651 (1993). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996). A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. *Id.* (citations omitted). The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will. *State v. Chandler*, 547 S.W.2d 918, 920 (Tenn. 1977). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)). With regard to the claim that a confession is involuntary, findings of fact made by the trial court after an evidentiary hearing on a motion to

suppress are afforded the weight of a jury verdict, and an appellate court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against the findings of the trial court. *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996) (citation omitted).

In the present case, the Appellant testified that he did not understand his rights because he had ingested numerous drugs and a large amount of alcohol prior to his arrest. After a suppression hearing, the trial court found the statement constitutional and ruled that it was admissible. We agree. The record indicates that the Appellant was advised fully and completely of his Miranda rights and at no time did the Appellant indicate that he did not understand his rights. Officer Bunn testified that the Appellant's "speech was good" throughout the interrogation, and he understood his rights even though he appeared sleepy. A sample of the Appellant's blood drawn within five to six hours after his arrest and statements revealed no alcohol or drugs in the Appellant's system. Furthermore, the Appellant testified that he confessed because he believed the blood tests would exonerate him of the charges. The trial court obviously accredited the testimony of Officer Bunn in finding a valid and knowing waiver of rights and finding a voluntary statement made from the free will of the Appellant. We find no reason to disregard the findings of the trial court with respect to the voluntariness of the Appellant's statement. As such, the trial court properly admitted the Appellant's statement into evidence.

## II. Blood Sample

Robert Marshall, a Tennessee Bureau of Investigation (TBI) forensic scientist in Jackson, testified that he received a five-milliliter blood sample taken from the Appellant after his arrest. He tested a one-milliliter portion for the presence of alcohol. The portion tested negative, and the remaining blood, four-milliliters, was transferred to the TBI lab in Nashville for drug testing. Edward Lewis Kuykendall, a TBI forensic scientist in Nashville, testified that he received a two-milliliter sample, rather than a four-milliliter sample. Kuykendall performed a "basic drug screen," for which the blood tested negative. The sample was not tested for the presence of barbiturates and marijuana because it had been completely consumed by prior testing. At trial, Kuykendall, in order to explain the discrepancy in the amount sent by Marshall and received by Kuykendall, testified to the following:

Q. Now, the sample that came in, could it have leaked out, or could it have dried up and stuck to the sides or anything like that?

A. I didn't see any sample that had been in a leaking fashion. Now, it was a blood tube, so, obviously, it was being contained in there. But when you're talking about glancing at a tube – I've dealt with Mr. Marshall for a long time, and he's dealt with my notations, also, and when we make those notations and we look at those tubes, it's a one gray five-milliliter tube. That means it can contain up to five-milliliters. It doesn't mean necessarily that it does. Now, he'll take and he does his portion. At that point in time, there is some amount left. That is an estimate of how much that is there, but that doesn't necessarily mean that by the time I get to it and I actually

-7-

draw it out, when I physically measure how much it is, that you're going to have exactly what he thinks he sent me or exactly what I look at. It's an estimate. It's an eyeball. But when I draw it out with a physical measuring instrument, then I know exactly how much is there. In that case, I had two-milliliters to work with.

The Appellant argues that he was materially harmed by the loss or unexplained absence of a portion of his blood sample because testing for barbiturates and marijuana would have shown that he was under the influence of drugs at the time he gave his statement to Officer Bunn, thereby, rendering his statement involuntary.

In *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), our supreme court addressed "what consequences flow from the State's loss or destruction of evidence alleged to have been exculpatory." *Ferguson*, 2 S.W.3d at 915. Specifically, our supreme court rejected the bad faith analysis required under the United States Constitution, set forth in *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988), and held that a broader inquiry is required under Article 1, Section 8 of the Tennessee Constitution. *Ferguson*, 2 S.W.3d at 914. The critical inquiry is whether a trial conducted without the lost or destroyed evidence would be fundamentally fair. *Id.*

In resolving the question of fundamental fairness, a court must first determine whether the State had a duty to preserve the lost or destroyed evidence. *Id.* at 917; *see also State v. Coulter*, 67 S.W.3d 3, 54 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 2001). "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." *Ferguson*, 2 S.W.3d at 917.

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488-489, 104 S. Ct. 2528, 2534 (1984)). Only if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty must a court turn to a balancing analysis involving consideration of the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* (footnote omitted); *see also State v. Ricky Hill Krantz*, No. M1999-02437-CCA-RM-CD (Tenn. Crim. App. at Nashville, Jan. 25, 2000), *perm. to appeal denied*, (Tenn. 2000).

Applying the above analysis to the instant case, we find that there is no proof in the record that the State lost, destroyed, or mishandled the Appellant's blood sample. Kuykendall explained the discrepancy in the sample amounts; thus, the evidence was not "lost or destroyed" by the State but, rather, was used for testing in its entirety . Furthermore, even if the State had a duty to preserve the blood sample and failed to do so, the Appellant has failed to show how testing for barbiturates and marijuana would have significantly affected the voluntariness of his confession. Officer Bunn testified that, at the time the statement was given, the Appellant understood his rights and only appeared sleepy. At the time of the motion to suppress hearing, none of the blood test results were available to the trial judge. The trial judge, finding the confession to be voluntary, assumed that the Appellant had ingested some sort of intoxicant. Based upon Officer Bunn's testimony the evidence does not preponderate against this finding. Therefore, the Appellant is not entitled to relief.

### III. Sufficiency of the Evidence

The Appellant argues that the evidence introduced at trial was insufficient to support his convictions for aggravated burglary, aggravated rape, and class E felony theft. A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. 1999); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Instead, the Appellant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). As in the case of direct evidence, the weight to be given circumstantial evidence and "the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958) (citation omitted).

Tennessee Code Annotated § 39-13-502(a)(2) (1997) defines aggravated rape as the "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . bodily injury to the victim." A person is guilty of aggravated burglary if that person, without the effective consent of the property owner, enters a habitation with intent to commit a theft. Tenn. Code Ann. §§ 39-14-

402(a)(3), -403(a) (1997). In order to sustain a conviction for theft, the State must prove that a person, with intent to deprive the owner of property, knowingly obtained or exercised control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103 (1997). Theft of property is a Class E felony if the value of the property obtained is more than $500 but less than $1,000. Tenn. Code Ann. § 39-14-105(2) (1997).

The proof at trial, in the light most favorable to the State, established that the Appellant and co-defendant forced their way into the victim's home with the intent to commit rape and theft therein. Both men proceeded to sexually penetrate the victim both vaginally and anally, causing bodily injury to the victim. After raping the victim, the men left the residence with items belonging to the victim. The testimony of the co-defendant and the Appellant's confession are sufficient to support the jury's verdict. This issue is without merit.

## IV.  Sentencing

The Appellant argues that his twenty-five-year sentence as imposed by the trial court was excessive. The Appellant was sentenced to concurrent sentences of two years for class E felony theft, six years for aggravated burglary, and twenty-five years for aggravated rape. He contends that the trial court improperly applied or weighed enhancement factors and failed to apply appropriate mitigating factors.

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169. When conducting a *de novo* review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Appellant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (1997); *Ashby*, 823 S.W.2d at 168. Furthermore, we emphasize that facts relevant to sentencing must be established by a preponderance of the evidence and not beyond a reasonable doubt. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000) (citing *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, where the trial

court fails to comply with the statutory provisions of sentencing, appellate review is *de novo* without a presumption of correctness.

In determining the Appellant's sentence, the trial court applied the following enhancement factors: (1) The Appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) The Appellant was a leader in the commission of an offense involving two or more criminal actors; (5) The Appellant treated or allowed the victim to be treated with exceptional cruelty during commission of the offense; (7) The offense involved a victim and was committed to gratify the Appellant's desire for pleasure or excitement; and (8) The Appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. Tenn. Code Ann. § 40-35-114(1), (2), (5), (7), (8) (Supp. 2001).

The Appellant first contends that enhancement factor (1) was misapplied because the trial court considered two charges, assault and vandalism, for which the Appellant was "placed on pre-trial diversion and apparently later dismissed." However, in addition to the two charges referenced by the Appellant, the record reflects that the Appellant has convictions for public intoxication and misdemeanor failure to appear. These convictions are sufficient to support the application of enhancement factor (1) to all of the Appellant's convictions.

The Appellant argues that enhancement factor (2) should not have been applied because his co-defendant, not he, was the leader in the offense. Specifically, he contends that:

> . . . Richard Forrest admitted his role in picking out the victim, had sole knowledge of her residence location, had trafficked in drugs with her, provided the tools to break in and was older than the Appellant herein. . . .

> The State elicited direct testimony by Richard Forrest, that he picked the victim, planned the robbery, procured the tools, tape, work gloves and bandannas, and removed the loot. Direct testimony by Trina Knowles was that she recognized Richard Forrest and that he was the first one to have sex with her, and it could be concluded that he was the only one based upon her testimony about being flipped over and subjected to anal intercourse almost simultaneously.

The trial court rejected the Appellant's argument that Richard Forrest was the leader in the commission of the offense, finding that:

> . . . [B]ased upon the proof in this case, [the Appellant] was in fact a leader in the commission of the offenses involving two or more criminal actors. I base that upon the proof that was presented during the trial of this case. Also having had the opportunity to observe the other co-defendant, both during his plea of guilty and sentencing, as well as listening to his testimony during the trial of this case.

And it is without question in the court's mind that this defendant, given his attitude, given the proof that was developed, that he was in fact a leader of a commission, the leader in the commission of this offense.

This court has held that "enhancement for being a leader in the commission of an offense does not require that the Appellant be the sole leader but only that he be 'a' leader" in the commission of the offense. *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993) (citation omitted). The co-defendant testified that the Appellant taped the victim's legs together and first "started having sex" with the victim. The victim testified that, after the rape, the Appellant and co-defendant threatened to kill her, wrapped a breathing tube and telephone cord around her ankles, and placed a New Year's Eve hat on her head. Based upon the circumstances of this case, we find the Appellant was a leader in the commission of these offenses. Furthermore, the trial court was in the best position to adjudge the demeanor and credibility of the witnesses. Accordingly, the trial court's application of enhancement factor (2) to all of the Appellant's convictions was proper.

The trial court applied enhancement factor (5), the Appellant treated or allowed a victim to be treated with exceptional cruelty during commission of the offense, to the aggravated rape conviction and placed great weight on this factor, concluding that: "I don't think I've ever had the misfortune to hear a case in which the victim, even including some homicides, was treated in the manner this victim was. The conduct of the defendants was vile. It – words to truly describe how heinous this crime is, escape the court." To support this aggravating factor, the State must prove "exceptional cruelty," demonstrating "a culpability distinct from and appreciably greater than that incident to" the crime. *Poole*, 945 S.W.2d at 98. In other words, such evidence must denote the infliction of pain or suffering for its own sake or from the gratification derived therefrom and not merely pain or suffering inflicted as the means of accomplishing the crime charged. *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Kelly Haynes*, No. W1999-01485-CCA-R3-CD (Tenn. Crim. App. at Jackson, Mar. 14, 2000)). Our courts have upheld the application of this factor based on proof of extensive physical abuse or torture, as well as proof of psychological abuse or torture. *Id.* (citations omitted). We acknowledge the inherently cruel nature of the rape and do not wish to minimize the anguish of the victim. However, we are bound by precedent and, therefore, are unable to conclude that the record supports application of the "exceptional cruelty" enhancement factor to the Appellant's aggravated rape conviction.

Regarding enhancement factor (7), the offense involved a victim and was committed to gratify the Appellant's desire for pleasure or excitement, we, also, find the trial court's application of this factor to the Appellant's aggravated rape conviction improper. Enhancement factor (7) calls into question an appellant's motive for committing a crime. *State v. Kissinger*, 922 S.W.2d 482, 491 (Tenn. 1996); *see also Arnett*, 49 S.W.3d at 261-62. "Human motivation is a tangled web, always complex and multifaceted." *Kissinger*, 922 S.W.2d at 491. Proving an appellant's motive will always be a difficult task. *Id.* "But the legislature . . . has placed that obligation on the State when the state seeks an enhanced sentence." *Id.* We find that the trial court improperly applied this factor because the State has failed to carry its burden of showing that the offense was committed to gratify

the Appellant's desire for pleasure or excitement above and beyond that inherent in the act of rape itself.

The Appellant does not contest the trial court's application of enhancement factor (8), *i.e.*, the Appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. The trial court applied this factor because the pre-sentence report reflected that the Appellant "has a pending felony escape charge" and a probation violation. However, the record fails to reflect a probation violation, and an escape charge is not a sentence involving release into the community. Accordingly, we find that, upon *de novo* review*,* enhancement factor (8) was misapplied to all of the Appellant's convictions.

With respect to mitigating proof, the Appellant contends that the trial court erred by not applying mitigating factor (6): The Appellant, because of youth or old age, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113(6) (1997). Specifically, the Appellant contends that he "is of a young age where mistakes and errors in judgment can occur" and, as a Range I standard offender, he "is considered amenable to rehabilitation." The trial court declined to apply mitigator (6), finding that:

> . . . [T]here's nothing to indicate that because of his youth he lacked the judgment, as the statute said, to realize essentially the nature of his conduct. . . . Certainly, he showed no judgment in committing the offense, but it was not because of his youth. It essentially just had to do with the commission of the crime.

In determining whether the sentence should have been mitigated because the Appellant lacked substantial judgment because of his youth, "courts should consider the concept of youth in context, *i.e.*, the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." *State v. Carter*, 908 S.W.2d 410, 413, (Tenn. Crim. App. 1995) (quoting *State v. Adams*, 864 S.W.2d 31, 33 (Tenn. 1993)). At the time of the commission of the offense, the Appellant was twenty years old and in good mental and physical health. Although he had dropped out of school in the eleventh grade, he had obtained his G.E.D. The Appellant worked as a deck hand for various barge and towing companies. His familiarity with the criminal justice system, his several opportunities at rehabilitation, and his active role in these crimes indicate a full appreciation for the seriousness of his acts. *Id.* From these facts, we think the trial court acted within its prerogative in determining that the Appellant was sufficiently mature to understand the nature of his conduct.

When there are enhancement factors and no mitigating factors, there is no presumptive sentence and the court may sentence above the minimum in the range. Tenn. Code. Ann. § 40-35-210(d). The weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. *State v. Boggs*, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). The weight to be afforded mitigating and enhancement factors derives from balancing

relative degrees of culpability within the totality of the circumstances of the case involved. *Boggs*, 932 S.W.2d at 476; *see also State v. Marshall*, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). Of particular weight in this case are the Appellant's prior convictions and his role as a leader in the commission of the offense. We conclude that the record supports the trial court's decision to enhance the Appellant's sentence. Therefore, we find that a sentence of twenty-five years is appropriate.

Additionally, the Appellant argues that he was penalized for exercising his constitutional right to plead not guilty and proceed to trial because the trial court was overcome by passion, prejudice, or caprice during the sentencing of the Appellant. However, because we find that the trial court properly applied enhancement factors (1) and (2), there is no evidence that the trial court acted improperly. This argument is without merit.

Based upon the foregoing principles, the judgments of conviction and resulting sentences of the Carroll County Circuit Court are affirmed.

_____
DAVID G. HAYES, JUDGE